# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 30, 2017

Mr. Daniel E. Correll
Mr. Andrew John Harakas
Clyde & Company
405 Lexington Avenue, 16 Floor
New York, NY 10174-0000

Mr. Justin M. Schmidt
Mr. Scott Raymond Torpey
Jaffe, Raitt, Heuer & Weiss
27777 Franklin Road, Suite 2500
Southfield, MI 48034

Mr. Mark Kelley Schwartz
Driggers, Schultz & Herbst
2600 W. Big Beaver Road
Suite 550
Troy, MI 48084

Re: Case No. 16-1042, *Jane Doe, et al v. Etihad Airways, P.J.S.C.*
Originating Case No. : 5:13-cv-14358

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0201p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

JANE DOE; JOHN DOE, husband and wife,

*Plaintiffs-Appellants,*

*v.*

ETIHAD AIRWAYS, P.J.S.C.,

*Defendant-Appellee.*

No. 16-1042

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-14358—John Corbett O'Meara, District Judge.

Argued: October 19, 2016

Decided and Filed: August 30, 2017

Before: BOGGS, SUHRHEINRICH, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mark Kelley Schwartz, DRIGGERS, SCHULTZ & HERBST, P.C., Troy, Michigan, for Appellants. Andrew J. Harakas, CLYDE & CO US LLP, New York, New York, for Appellee. **ON BRIEF:** Mark Kelley Schwartz, DRIGGERS, SCHULTZ & HERBST, P.C., Troy, Michigan, for Appellants. Andrew J. Harakas, Daniel E. Correll, CLYDE & CO US LLP, New York, New York, Scott R. Torpey, JAFFE RAITT HEUER & WEISS, Southfield, Michigan, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. Plaintiff Jane Doe and her eleven-year-old daughter flew aboard Etihad Airways from Abu Dhabi to Chicago. For the duration of the fourteen-hour journey,

Doe's tray table remained open in her lap because a knob that was meant to hold it in place had fallen to the floor. During the flight, Doe's daughter found the knob on the floor and gave it to Doe, who placed it in a seatback pocket. When it came time to descend, an Etihad flight attendant (unaware of the detached knob) gave Doe the familiar reminder to place her tray table in the upright and locked position for landing. Doe, of course, could not comply. To aid in explaining her problem, she reached into the seatback pocket to retrieve the fallen knob. But when she stuck her hand into the pocket, she was unexpectedly pricked by a hypodermic needle that lay hidden within. She gasped, and the needle drew blood from her finger.

Doe claims damages from Etihad for both her physical injury and her "mental distress, shock, mortification, sickness and illness, outrage and embarrassment from natural sequela of possible exposure to" various diseases. Her husband claims loss of consortium. The Montreal Convention of 1999, an international treaty under which these claims arise, imposes strict liability (up to a monetary cap) upon Etihad "for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft." Etihad concedes that an accident onboard its aircraft caused Doe to suffer a bodily injury. But Etihad argues that "damage sustained in case of . . . bodily injury" means only "damage *caused by* bodily injury," and thus does not include Doe's fear of contagion and other emotional-distress and mental-anguish damages—damages that Etihad claims were caused *not* by Doe's *bodily injury* (the small hole in her finger) but by the *nature of the instrumentality* of that injury (the needle). The district court agreed and granted partial summary judgment for Etihad. But the district court erred both in reading the additional "caused by" requirement into the treaty and in concluding that Doe's bodily injury didn't cause her emotional and mental injuries. The plain text of the Montreal Convention allows Doe to recover all her "damage sustained" from the incident, which includes damages for both physical injury and accompanying emotional or mental harm. So, for the reasons that follow, we reverse and remand.

# I

When Doe was pricked by the needle, the passenger seated in the aisle seat to her right heard Doe exclaim, "ouch," and saw her finger bleeding. The Etihad flight attendant who had

come to Doe's seat picked up the needle and what was later determined to be its accompanying insulin syringe, both of which Doe had placed on her tray table. But the flight attendant then returned the items to the tray table and left to summon the assistance of her supervisor. Because the airplane had begun its descent, the flight attendants did not have access to the flight deck, which was where the only onboard sharps box was located, nor were the flight attendants permitted to call the flight deck absent a more pressing emergency.

The flight attendant returned with her supervisor. The flight attendant took the needle and syringe, placed them in an empty water bottle, capped the bottle, and later turned the bottle over to her cabin manager. The supervisor, meanwhile, gave Doe an antiseptic wipe, which Doe used to wipe her finger, and a Band-Aid, which the supervisor himself wrapped around her finger. The cabin manager wrote a report of the incident and told Doe that Etihad would contact her. A flight attendant recommended that Doe see a doctor, but Etihad provided no medical assistance other than the antiseptic wipe and Band-Aid.

The next day, Doe saw a family physician, who noted a "small needle poke" on Doe's finger. Doe was prescribed medication for possible exposure to hepatitis, tetanus, and HIV, and she underwent several rounds of testing over the following year. Thankfully for Doe, all the tests came back negative. Nevertheless, Doe claims that she refrained from sexual intercourse with her husband and from sharing food with her daughter until one year after the incident, when her doctor told her that she could be certain that she had not contracted a disease from the needlestick.

Two days after the flight, Doe sent an email to Etihad to follow up because Etihad had neither sent her a copy of the incident report nor offered her any further assistance. One week later, Etihad replied by email to offer a "purely goodwill gesture" of "possible reimbursement" of Doe's medical expenses, "without any admission of liability." This litigation followed.

# II

Plaintiffs filed suit against Etihad in the United States District Court for the Eastern District of Michigan.[1]  Etihad, an entity wholly owned by the Government of Abu Dhabi, United Arab Emirates, is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a).  But as a condition of Etihad's Foreign Air Carrier Permit—issued by the United States Department of Transportation to permit Etihad to fly to United States airports—Etihad waived sovereign immunity from suit in United States courts and could thus be sued "in any judicial district in which [Etihad] is licensed to do business or is doing business," which includes the Eastern District of Michigan because of Etihad's codeshare and other business agreements with airlines operating from points within that district.  28 U.S.C. § 1391(f); *see* 49 U.S.C. § 41301.[2]

Following discovery, Etihad moved for, and the district court granted, partial summary judgment in favor of Etihad as to Doe's claims for mental-anguish and emotional-distress damages, including fear of contagion.  (For simplicity, we will refer to these various claims collectively as Doe's claims for mental anguish.[3])  The partial-summary-judgment order also dismissed Doe's husband's derivative claim for loss of consortium.  Doe declined to pursue a lost-earnings claim that she had pleaded in her complaint, leaving only her claim for the physical pain, suffering, and medical expenses caused by the needlestick, which the parties stipulated to be *de minimis* relative to the dismissed claims.  (These *de minimis* damages include the physical pain and suffering from being *pricked* by the needle: the small hole in Doe's finger and the "ouch," so to speak.  But they do not include any mental anguish arising from the fact that it was

---

[1]At first blush, the Eastern District of Michigan seems an unlikely venue for this action.  Plaintiffs reside in Grand Rapids, in the Western District of Michigan, and no part of Plaintiffs' itinerary included travel to points in the Eastern District of Michigan.  But Plaintiffs' counsel is based in Oakland County, Michigan (in the Eastern District), and, as we discuss in this paragraph, venue was proper in the Eastern District of Michigan because of Etihad's status as a "foreign state."

[2]Etihad's status as a foreign state also entitles it by statute to a bench trial rather than a jury trial.  *See* 28 U.S.C. § 1441(d).

[3]Mental anguish and emotional distress are distinct harms under Michigan damages laws.  *See, e.g.*, *McClain v. Univ. of Mich. Bd. of Regents*, 665 N.W.2d 484, 488 (Mich. App. 2003) (per curiam).  But this distinction does not affect the determination of whether Etihad may be subject to *liability* for such harms under the Montreal Convention; the distinction matters, if at all, only in our discussion of the *measure* of damages in Section IV, *infra*.

a *stray needle* and not, for example, a sterilized toothpick, that pricked Doe's finger. The logic behind this distinction is that if something like a sterilized toothpick had caused Doe's bodily injury, then Doe would not have had any reasonable fear of contagion, so Doe's fear of contagion must arise from the fact that it was a needle that caused her injury, rather than arising from the injury itself, and Doe's fear of contagion is therefore not recoverable as "damage sustained in case of bodily injury" under the Montreal Convention. This logic is faulty, of course, because Doe's injury *was an injury caused by a needle* and was not the same as the injury that a sterilized toothpick would have caused, even if arguably similar. We will discuss this more fully in Section III.A, *infra*.) The parties reached a settlement as to these *de minimis* damages, and the parties agreed to a "Stipulation and Order of Dismissal with Prejudice," so that Plaintiffs could immediately appeal the district court's partial-summary-judgment order.

We first discuss, in Section III, whether the district court erred in holding that Doe's mental-anguish damages were not recoverable under Article 17(1) of the Montreal Convention, and—after analyzing both the plain text of the treaty and relevant persuasive authorities—we conclude that the district court did so err. Then, in Section IV, because the Montreal Convention provides rules for *liability* but looks to local law for the *measure* of damages, we conduct a choice-of-law analysis and hold that Michigan damages law governs both the amount of any damages Etihad comes to owe Doe and the ability of Doe's husband to recover loss-of-consortium damages.

### III

The parties agree that Article 17(1) of the Montreal Convention, a multilateral treaty to which the United States is a signatory, provides Plaintiffs' only avenue for recovery against Etihad. *See* Convention for the Unification of Certain Rules for International Carriage by Air, art. 17, May 28, 1999, S. Treaty Doc. 106-45, ICAO Doc. No. 9740, 1999 WL 33292734 (entered into force Nov. 4, 2003) (Montreal Convention). More than 125 countries, including the United Arab Emirates, have signed, ratified, or acceded to the Montreal Convention since 1999.

The interpretation of a treaty is a question of law that we review de novo. *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000). Under the Supremacy Clause, treaties are "the

supreme Law of the Land." U.S. Const. art. VI, cl. 2. Neither our court nor the Supreme Court has yet interpreted any provision of the Montreal Convention. The Warsaw Convention (the Montreal Convention's longstanding predecessor treaty), however, has been the subject of much litigation over the past eighty years, and interpretations of the Warsaw Convention have at least some persuasive value in interpreting parallel provisions of the Montreal Convention.[4]   *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. 876, 137 L.N.T.S. 11 (Warsaw Convention); *In re Air Crash at Lexington, Ky.*, 501 F. Supp. 2d 902, 907–08 (E.D. Ky. 2007) (noting that "the 'common law' of the Warsaw jurisprudence is vitally important to understanding the meaning of the Montreal Convention") (quoting *Baah v. Virgin Atl. Airways*, 473 F. Supp. 2d 591, 596 n.7 (S.D.N.Y. 2007)); *see also, e.g.*, *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996) (interpreting Warsaw Convention Article 17), *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530 (1991) (same), *Air France v. Saks*, 470 U.S. 392 (1985) (same). As with the Montreal Convention, the Warsaw Convention provided international air passengers' exclusive remedy for claims governed by that treaty. *See, e.g.*, *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168–69 (1999) (holding that the Warsaw Convention provided the sole remedy for personal-injury claims arising from injuries sustained during international air travel, even if the injured party could not state a claim for relief under the Warsaw Convention, in which case no remedy was available at all).

## A. Textual Analysis

Our analysis of Article 17(1) of the Montreal Convention "must begin . . . with the text of the treaty and the context in which [its] written words are used." *Saks*, 470 U.S. at 397 (citing *Maximov v. United States*, 373 U.S. 49, 53–54 (1963)). The text of Article 17(1) provides:

> The carrier is liable for damage sustained in case of death or bodily injury of a
> passenger upon condition only that the accident which caused the death or injury

---

[4]The Warsaw Convention continues to govern disputes involving parties from countries that are signatories to the Warsaw Convention but not signatories to the Montreal Convention. Russia, for example, is a party to the Warsaw Convention and did not ratify the Montreal Convention until 2017, so the Warsaw Convention would govern claims against Russian airlines arising from incidents that occurred prior to Russia's ratification of the Montreal Convention.

took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Montreal Convention art. 17(1).

### 1. *Etihad's Argument*

The contested language here is "in case of." Etihad's argument has two components: its understanding of what "in case of" means, and its application of that understanding to the facts of this case.

First, Etihad argues that "in case of" means "caused by," Appellee's Br. 4, or perhaps "caused directly by," *see id.* at 21. If we impose Etihad's reading of Article 17(1) back onto the text of the treaty, Etihad is then "liable for damage sustained [caused directly by] death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft . . . ." Thus, according to Etihad, in order for Doe to recover for her mental anguish under Article 17(1), Doe would have to prove that (1) an "accident" caused her "bodily injury" on board an aircraft *and* (2) her "bodily injury" (i.e. the small hole in her finger) directly caused her "damage sustained" (i.e., her mental anguish).

Second, Etihad concedes that an accident caused Doe to suffer a bodily injury on board its aircraft, but Etihad argues that Doe's bodily injury *did not* directly cause her mental anguish: according to Etihad, Doe's anguish was caused not by her "bodily injury" (i.e., the needlestick,[5] the physical puncture wound) but rather by the "accident" that caused the injury (i.e., being stuck by a needle, as opposed to being stuck by something else). Order Granting Def.'s Mot. for Partial Summ. J. 4 (emphasis added) (citations omitted) ("Plaintiff's mental distress damages were not caused by her physical injury. It is not the physical needle prick itself that caused Plaintiff's distress, but the possibility that she may have been exposed to an infectious disease."); *see* Appellee's Br. 17 ("[Doe's] mental anguish damages arise from the nature of the accident itself and were not caused by the bodily injury"), *id.* at 20 ("because the plaintiffs' mental

---

[5]The Oxford English Dictionary defines "needlestick" as "an accidental stab wound produced by a hypodermic or surgical needle, esp. as a risk factor for the transmission of blood-borne diseases to health-care workers." *Needle*, Oxford English Dictionary, http://www.oed.com/view/Entry/125771 (last visited Aug. 29, 2017).

injuries were caused by the 'accident' itself and not the 'bodily injuries' sustained in the accident, there could be no recovery under the Convention").

A simple diagram helps to illustrate Etihad's curious understanding:



As this diagram indicates, according to Etihad, mental anguish caused directly by the bodily injury is recoverable, but mental anguish that merely *accompanies* the bodily injury, and which is instead caused more generally by the *accident*, is not recoverable.

### 2. *Plain Meaning of the Text*

But "in case of" does not mean "caused by."

Rather, the plain meaning of "in case of" is "if there is" or "in the event of" or "during a case in which there is." The Oxford English Dictionary, for example, defines "in case" (as a conjunction) as, "In the event that; if it should happen that; if," and defines "in case of" (as an adverb) as "in the event of (esp. something untoward). Now frequently in *in case of emergency*." *In case*, Oxford English Dictionary, http://www.oed.com/view/Entry/426263 (last visited Aug. 29, 2017). The Canadian Oxford Dictionary has similar definitions and is a seemingly apt dictionary for identifying the contemporaneous meaning of terms in the Montreal Convention, given that the dictionary was first published in 1998 and then updated in 2004,

while the treaty was signed in 1999 (in Canada) and entered into force in 2003. *See Case*, The Canadian Oxford Dictionary (2d ed. 2004), http://www.oxfordreference.com/view/10.1093/acref/9780195418163.001.0001/m_en_ca0011030?rskey=8fa6U0&result=11001 (defining "in case" as "in the event that; if," and defining "in case of" as "in the event of").

Clearly, the plain meaning of "in case of" is *conditional*, not *causal*. To say *in case of X, do Y* is to say "if X happens, then do Y"—none of which means that there is a causal relationship between X and Y—just as to say *in case of a compensable bodily injury, the passenger may recover damage sustained* is to say "if there is a compensable bodily injury, the passenger may recover damage sustained." But to adopt Etihad's meaning of "in case of," we would impose an additional causal restriction onto the text of Article 17(1) that the plain text does not contemplate. Indeed, imposing such an additional causal restriction would *contradict* the plain text, which states that "[t]he carrier is liable for damage sustained in case of . . . bodily injury . . . *upon condition only* that the accident which caused the death or bodily injury took place on board the aircraft or [while] embarking or disembarking." Montreal Convention art. 17(1) (emphasis added).

The phrase "upon condition only" is new to the Montreal Convention—it is not found in the Warsaw Convention (either in English or in the official French version)[6]—and it makes clear

---

[6] The official text of Article 17 of the Warsaw Convention provides in full:

Le transporteur est responsable du dommage survenu en cas de mort, de blessure ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de débarquement.

Warsaw Convention art. 17.

Only the French text of the Warsaw Convention is authoritative, but the United States Supreme Court has employed as persuasive authority an official English translation of that text, which was presented to the United States Senate when it consented to ratify the Warsaw Convention in 1934, and which provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 Stat. 3014; *see Olympic Airways v. Husain*, 540 U.S. 644, 649 n.4 (2004); *Saks*, 470 U.S. at 397.

For the most part, the language of the Warsaw Convention's Article 17 is the same as the language of the Montreal Convention's Article 17(1). Notably, the "in case of" language in the Montreal Convention replaced "en cas de" from the Warsaw Convention, which was translated from the French in the above translation as "in the event

that the passenger's recovery is conditioned *only* on the occurrence of an accident that causes death or bodily injury either on board the aircraft or during boarding or deplaning. Surely, the drafters of the Montreal Convention could have used a word or phrase with causal meaning instead of "in case of" if they wanted to impose such a causal restriction on the kinds of "damage sustained" that are recoverable when an accident on board an aircraft causes a passenger to incur a bodily injury. Indeed, the drafters *did* impose such a causal requirement in stating that the accident must have "caused" the death or bodily injury. The drafters' use of "caused" to express that an accident must have caused the bodily injury thus provides additional support for our conclusion that the drafters did not, in the very same sentence, use "in case of" *also* to mean "caused by."

### 3. The Underpinnings of Etihad's Argument

Admittedly, in light of the foregoing discussion, Etihad's position—that "in case of" *does* mean "caused by"—may seem absurd. But it is not, and that is because Etihad's argument is rooted in a Warsaw Convention decision of the Second Circuit Court of Appeals in which that court held that American Airlines was *not* liable under the Warsaw Convention "for mental injuries that were not *caused by* physical injuries." *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 368 (2d Cir. 2004) (emphasis added). Etihad asks us to adopt the Second Circuit's Warsaw Convention decision in *Ehrlich* to decide the Montreal Convention case before us. But the Montreal Convention is a new treaty that we interpret as a matter of first impression, and there is no legal authority that would require us to import *Ehrlich*'s Warsaw Convention determination to govern this Montreal Convention claim.

In *Ehrlich*, an American Eagle[7] aircraft overshot its designated runway upon landing at New York's JFK International Airport. An arrestor bed—a bed of material made of water, foam, and cement that crushes under the weight of an airplane, increasing drag and helping bring the airplane to a stop—saved the plane from plunging into the waters of Thurston Bay, which lay

---

of." And, as discussed above, the "upon condition only" language in the Montreal Convention was new: it replaced "lorsque" from the Warsaw Convention, which was translated from the French in the above translation as "if."

[7] American Eagle is a brand name under which various regional air carriers operate flights on behalf of American Airlines.

200 feet beyond where the plane came to a halt.  To evacuate the aircraft, passengers had to jump six to eight feet from its doorway.  *Ibid.*

Gary and Maryanne Ehrlich were passengers on the flight.  They contended that they suffered bodily injuries (neck, back, shoulder, hip, and knee injuries; hypertension; and a heart problem) during the abnormal landing and subsequent evacuation.  They also alleged mental injuries including a fear of flying, nightmares, and trouble sleeping.  The district court granted partial summary judgment for the airline defendant as to the mental injuries on the basis that "a plaintiff may only recover for emotional damages *caused by* physical injuries."  *Id.* at 369 (quoting *Ehrlich v. Am. Airlines*, 99-CV-6013, 2002 U.S. Dist. LEXIS 21419, at \*10 (E.D.N.Y. June 21, 2002) (emphasis added)).  The Second Circuit affirmed, noting that "the Ehrlichs had offered no evidence demonstrating a causal connection between their mental and physical injuries."  *Ehrlich*, 360 F.3d at 369.[8]

---

[8]A footnote in *Ehrlich* clarifies that the sole dispute between the Ehrlichs and the airline was whether the airline was liable for mental anguish that *only accompanies* bodily injury and is *not caused by* bodily injury—the Ehrlichs did not argue, as Doe does here, that their bodily injuries in fact caused their mental injuries:

> For the purposes of this appeal, American Eagle does not dispute that the Ehrlichs allegedly sustained mental and bodily injuries which were caused by an accident that took place on board its aircraft or during the evacuation therefrom.  Moreover, on appeal, the Ehrlichs do not challenge the district court's conclusion that they failed to raise "a genuine issue of fact regarding a causal connection between their alleged bodily injuries and their mental suffering."  *See Ehrlich*, 2002 U.S. Dist. LEXIS 21419, at \*11.  Instead, their appeal focuses on whether the court properly construed Article 17.  Accordingly, we need not address whether an accident caused the Ehrlichs to suffer injuries on board an aircraft or in the course of any of the operations of disembarking; we also need not address whether the Ehrlichs' alleged physical injuries caused their alleged mental injuries.

*Ehrlich*, 360 F.3d at 374 n.8.

It is worth reiterating that in the present case, Doe's mental anguish *is* traceable to her bodily injury, whereas in *Ehrlich*, it is easier to comprehend the airline's argument that the Ehrlichs' bodily injuries did *not* cause their mental injuries.  There, the Ehrlichs' alleged mental injuries of fear of flying and sleeplessness could have been caused by the emergency landing (and *not* by the bodily injuries sustained during the evacuation).  The "accident," then could be understood as the emergency landing, which (because it resulted in the evacuation) caused the bodily injuries sustained in the evacuation, and which separately caused mental injuries that the Ehrlichs would have sustained regardless of whether they sustained any bodily injuries at all.  Of course, it is also possible that the Ehrlichs' mental injuries caused by the emergency landing were *exacerbated* by the evacuation (or indeed, exacerbated by the bodily injuries they sustained during the evacuation)—but because the Ehrlichs did not argue that their bodily injuries caused their mental injuries, the Second Circuit was presented with a record on which it was easier than it is in our case to view the claimed mental injuries as being "caused by the accident" rather than "caused by the bodily injury."

*Ehrlich* reached its conclusion only after grappling at length with the original French text of the Warsaw Convention, finding it ambiguous as to whether it held airlines liable for mental injuries that are not caused by a compensable bodily injury, and inquiring into the original purpose of the Warsaw Convention when it was signed in 1929. Indeed, *Ehrlich* discussed the Montreal Convention as well: the Montreal Convention was signed just weeks after the Ehrlichs' emergency landing, and the Montreal Convention entered into force after the Second Circuit heard argument in *Ehrlich* but before it issued its opinion. *See id.* at 372. But *Ehrlich* expressly rejected the argument that the Montreal Convention had any retroactive applicability to the Ehrlichs' claim, and the Second Circuit based its decision entirely on its interpretation of the Warsaw Convention. *See id.* at 373 ("neither the Montreal Convention nor the intentions of its drafters govern this appeal").[9]

In reaching its conclusion, *Ehrlich* followed the lead of *Jack v. Trans World Airlines*, 854 F. Supp. 654, 663–68 (N.D. Cal. 1994), a district-court decision that also concluded that "only emotional distress *flowing from* the bodily injury is recoverable" under Article 17 of the Warsaw Convention. *Id.* at 665 (emphasis added). *Jack* expressly acknowledged (after rejecting other possible interpretations of the Warsaw Convention) that its interpretation "does read a causal component into the phrase 'damage sustained in the event of,'" but nevertheless went ahead with such an interpretation because that interpretation was "not prohibited" by the United States Supreme Court's Warsaw Convention precedents. *Id.* at 668.

But "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, [is] an usurpation of power, and not an exercise of judicial functions." *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821) (holding that the 1795 U.S.–Spain Treaty for safe passage of ships did not protect a Spanish claimant from United States condemnation of a schooner during the War of 1812 when the requisite passport mandated by the treaty was not affixed to the vessel). Both *Ehrlich* and *Jack* interpolated a causal component into the Warsaw Convention that was not required by the text, and both did so expressly to serve the Warsaw

---

[9]Moreover, because the Montreal Convention was signed well before the litigation in *Ehrlich* began, there is no reason to suppose that the drafters of or parties to the Montreal Convention took *Ehrlich* to be a legal precedent that would aid signatories in future analysis of the text of Article 17(1) of the Montreal Convention.

Convention's purpose of "limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry." *Ehrlich*, 360 F.3d at 385 (quoting *Floyd*, 499 U.S. at 546); *see also Jack*, 854 F. Supp. at 662, 665 ("such an approach furthers the pro-airline industry goals of the Warsaw Convention because it is so restrictive of passengers' rights"). To be sure, both *Ehrlich* and *Jack* found ambiguity in the original French text of the Warsaw Convention before inquiring into the purpose of that treaty and seeking to give effect to that purpose. But what that should mean for us is *not*, as Etihad would have it, that we should blindly adopt *Ehrlich* as the law of our circuit for claims under Article 17(1) of the Montreal Convention, but rather that we should grapple with the text of the Montreal Convention itself, and then, to the extent that we find any ambiguity therein, look to relevant persuasive authority—which may include evidence of the purpose of the *Montreal* Convention, but almost certainly not the nearly century-old purpose of the *Warsaw* Convention—to assist us in resolving that ambiguity.

*Ehrlich* recognized that "the Montreal Convention is an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention." *Ehrlich*, 360 F.3d at 371 n.4. So do we. The Montreal Convention was signed in 1999, in six languages including English, and we are charged with interpreting that English text in the first instance rather than clinging to the Second Circuit's purposivist interpretation of a French-language predecessor treaty signed in 1929. In Sections III.B through III.E, *infra*, to fortify our textual analysis of Article 17(1), we will discuss more fully the relative purposes of the Warsaw and the Montreal Conventions, and we will address relevant decisions of the United States Supreme Court and other courts, which provide useful context for both *Ehrlich* and our decision here. But for now, it suffices to say that *Ehrlich* and *Jack* do not provide insight into meaning of the *plain text* of Article 17(1) of the Montreal Convention.

### 4. *Our Textual Interpretation*

Here, then, is a fairer illustration of what damages are recoverable under Article 17(1) according to the plain text of the Montreal Convention:



As this diagram makes clear, because an accident onboard Etihad's aircraft caused Doe to suffer a bodily injury (a fact that Etihad concedes), Doe may therefore recover damages for her mental anguish, regardless of whether that anguish was caused directly by her bodily injury or more generally by the accident that caused the bodily injury. That is because, either way, Doe's mental anguish is "damage sustained in case of"—i.e., "in the event of" a compensable bodily injury.

What the plain text of Article 17(1) also makes clear is that a passenger cannot recover damages for mental anguish if there is no requisite accident or if the accident does not cause a bodily injury. For example, if ordinary turbulence causes a passenger to suffer an anxiety attack, the Montreal Convention would not allow the passenger to recover damages for the anxiety

---

[10]The meaning of "accident" is not disputed here. The United States Supreme Court has consistently interpreted "accident" in Article 17 of the Warsaw Convention to mean "an unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U.S. at 405; *see also Husain*, 540 U.S. at 650. We will discuss *Saks* and *Husain* in context in Section III.C.1, *infra*.

attack because ordinary turbulence is not an "accident."  Likewise, if there is an accident, such as an emergency landing, and a passenger escapes physically unscathed but mentally harmed, the passenger is barred from recovering mental-anguish damages for want of the required bodily injury.  This understanding is supported by the plain text of Article 17(1) of the Montreal Convention—and it also happens to have the advantage of being simpler than *Ehrlich*'s approach.

Admittedly, however, the text of Article 17(1) is still not entirely clear as to what connection must exist between the required bodily injury and claimed mental anguish.  The plain text of Article 17(1) is sufficient on its own to reject Etihad's interpretation of it.  And the plain text of Article 17(1) allows our conclusion that when a single "accident" causes both bodily injury and mental anguish, that mental anguish is sustained "in case of" the bodily injury.  But the plain text on its own does not *necessarily* require that a single accident cause both the required bodily injury and the claimed mental anguish in order for that mental anguish to be "sustained in case of" the bodily injury, as our conclusion suggests.

What if, for example, there are two accidents: first, unusually rough turbulence (which causes a passenger mental anguish but no bodily injury), and second, an unrelated emergency landing, during which every passenger sustains at least some bodily injury.  Does the bodily injury sustained in the emergency landing allow the passenger who had previously suffered severe emotional distress to recover for that distress?  That is, is mental anguish from the *first* accident considered "damage sustained in case of bodily injury" because it was sustained during the same flight as the second accident, which caused bodily injury?

On the one hand, it seems reasonable to read the "in case of" language as precluding recovery of damages for mental anguish in the example presented in the preceding paragraph, and our interpretation of Article 17(1) implicitly supports such a conclusion; but on the other hand, the text of the treaty does not explicitly prohibit such recovery.  So, both to bolster our conclusion that mental anguish is "sustained in case of" a bodily injury when it arises from the same accident that caused that bodily injury, and to reinforce the proposition that *Ehrlich* does not control this case, we review relevant persuasive authorities that provide insight into the meaning of Article 17(1) in the context of its ratification by its signatories.  *See, e.g.*, *Saks*,

470 U.S. at 396 ("[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty [and] the negotiations" that produced the treaty. (alteration in original) (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943))). We therefore turn next to the history of the negotiations that culminated in the signing of the Montreal Convention and to evidence of the signatories' purpose in ratifying the Montreal Convention.

This historical inquiry is important because the question before us is important. And the question before us is important for several reasons. First, Article 17(1) governs not only claims for needlesticks, snakebites, and the like, but also claims for injuries and fatalities sustained in plane crashes. Second, "uniformity is an important goal of treaty interpretation," *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 383 (2006), so we look to the history of the Montreal Convention to ensure that the conclusion we draw today is consistent with how our sister signatories would understand the text of Article 17(1). Third, the Warsaw Convention's analogue to the question before us was expressly left unanswered by the United States Supreme Court in *Floyd* when it ruled that mental injury *standing alone* was not recoverable under the Warsaw Convention because of the absence of the required death or bodily injury:

> We conclude that an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury. Although Article 17 renders air carriers liable for "damage sustained in the event of" . . . such injuries, we express no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries. That issue is not presented here because respondents do not allege physical injury or physical manifestation of injury.

*Floyd*, 499 U.S. at 552–53.

Fourth, although we have expended considerable effort explaining that the Montreal Convention is a new treaty that we should interpret independently of the Warsaw Convention, such that *Ehrlich* does not inform our decision here, there is nonetheless evidence that the drafters of the Montreal Convention intended Article 17(1) to be construed consistently with well-settled Warsaw Convention precedents of the United States Supreme Court. *See* Explanatory Note to Montreal Convention, art. 17, S. Treaty Doc. 106-45, 1999 WL 33292734,

at *16 (2000).[11]   These precedents, as we will discuss, include the United States Supreme Court's decision defining "accident" (in *Saks*, a decision from 1985 that has gained global currency).   But these precedents do not include *Ehrlich*, which was decided well after the Montreal Convention was signed (and which was not a decision of a signatory's highest court, in any event, *see, e.g.*, *Husain*, 540 U.S. at 655 n.9).

And finally, while *Ehrlich* was a Warsaw Convention decision, we recognize that our conclusion today is directly contrary to *Ehrlich*'s conclusion as to a similarly worded provision. The history behind the Montreal Convention will make clear why the conclusion we reach today is correct, and why we cannot use the same lines of reasoning that *Ehrlich* and *Jack* used in reaching their holdings that denied recovery for mental injuries that accompanied but did not directly flow from a bodily injury.

---

[11]This Explanatory Note, though not controlling, is nevertheless insightful in that it also indicates that the drafters of Article 17(1) did not aim to limit recovery for mental anguish to what would have been available under the Warsaw Convention.  The Explanatory Note for Article 17(1) is provided here in full:

> Paragraph 1 provides for carrier liability for death or bodily injury of a passenger caused by an accident on board the aircraft or in the course of embarking or disembarking.  The carrier's limited defenses to liability are provided for elsewhere in the Convention (i.e., Article 21, below).  It is expected that this provision will be construed consistently with the precedent developed under the Warsaw Convention and its related instruments.

> Following extensive debate, the Conference decided not to include an express reference to recovery for mental injury, with the intention that the definition of "bodily injury" would continue to evolve from judicial precedent developed under Article 17 of the Warsaw Convention, which uses that term.  *See* International Conference on Air Law, Vol I Minutes at p. 201 (Thirteenth Meeting, May 25, 1999, Summary of the Chairman of the Conference).   The Conference adopted the following Statement, recorded in the Minutes of the Proceedings:

>> With reference to Article 16 [sic], paragraph 1 of the Convention, the expression 'bodily injury' is included on the basis of the fact that in some States damages for mental injuries are recoverable under certain circumstances, that jurisprudence in this area is developing and that it is not intended to interfere with this development, having regard to jurisprudence in areas other than international carriage by air; ….

> International Conference on Air Law, Vol. I Minutes at pp. 242-43 (Plenary, Sixth Meeting, May 27, 1999).

> The reference in this statement to "jurisprudence in areas other than international carriage by air" reflects the concern of some States that jurisprudence under Article 17(1) of the Convention should not develop in a particular State beyond the then current jurisprudence of that State.  Rather, that jurisprudence should continue to develop in a manner consistent with, not ahead of, jurisprudence in other areas in such States.

Explanatory Note to Montreal Convention, art. 17, S. Treaty Doc. 106-45, 1999 WL 33292734, at *16–17.

### B.  History and Purpose of the Montreal Convention

The Warsaw Convention was opened for signature in 1929, just two years after Charles Lindbergh famously flew his *Spirit of St. Louis* solo from New York to Paris, and eight years before Amelia Earhart disappeared over the Pacific Ocean.  The original parties to the Warsaw Convention had the "primary purpose of . . . limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry."  *Floyd*, 499 U.S. at 546 (citing *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 256 (1984); Minutes, Second Int'l Conf. on Private Aeronautical Law, October 4–12, 1929, Warsaw 37 (R. Horner & D. Legrez trans. 1975) ("Warsaw Conference Minutes"); and Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L. Rev. 497, 498–99 (1967)).

The Warsaw Convention itself was the product of four years of work by a committee of experts that was appointed in 1925 at an international conference in Paris at which an early draft protocol was circulated.  That draft protocol included an expansive liability provision, holding the carrier "liable for accidents, losses, breakdowns, and delays" without imposing any requirement of death or bodily injury.  Ministère des Affaires Étrangères, *Conférence Internationale de Droit Privé Aérien (27 Octobre–6 Novembre 1925)*, 79 (1926), as translated in *Floyd*, 499 U.S. at 542.

By the time the conference in Warsaw began in 1929, the committee had divided the protocol on liability into three separate provisions (one for injury to passengers, one for damage to goods, and one for losses from delays).  This text was then further developed in Warsaw until the final version of the Warsaw Convention was agreed upon—with much narrower language in Article 17 for air carriers' liability to injured passengers.  *See* Warsaw Conference Minutes at 205–06; *Floyd*, 499 U.S. at 543.  Moreover, unlike the Montreal Convention's strict-liability scheme, the Warsaw Convention imposed a cap on damages at 125,000 gold French francs (at the time, approximately $8,300) per passenger, which carriers could reduce to zero upon showing that they had exercised due care by taking "all necessary measures to avoid the damage or that it was impossible" to do so.  The cap on damages was lifted (so as to allow potentially unlimited liability) only if the carrier's "willful misconduct" caused the injury or death.  Warsaw Convention arts. 17, 20, 22.

The United States Supreme Court has stated that "it is reasonable to infer that the Conference adopted the narrower language [in Article 17] to limit the types of recoverable injuries." *Floyd*, 499 U.S. at 543. "Whatever may be the current view among Convention signatories, in 1929 the parties were more concerned with protecting air carriers and fostering a new industry rather than providing a full recovery to injured passengers." *Id.* at 546.

The Warsaw Convention entered into force in 1933, and the United States became a party to it in 1934. Paul S. Dempsey & Michael Milde, *International Air Carrier Liability: The Montreal Convention of 1999*, 13 (McGill Univ. Centre for Research in Air & Space Law) (2005). The United States subsequently led various efforts to modernize it and raise its liability limits. *See* Montreal Convention, 1999 WL 33292734, at *3–5 (Letter of Submittal from President Clinton to United States Senate) ("Letter of Submittal") (detailing history of Warsaw Convention and proposed modifications). In the early 1950s, the newly created International Civil Aviation Organization (ICAO) began evaluating a potential increase to the liability limits at international conferences in Rio de Janeiro and The Hague. At The Hague, the United States proposed raising the personal-liability limits to approximately $25,000, but the majority of other participants resisted; the United States countered with a reduced proposal of approximately $20,000, which was also met with disapproval. "It was not until the United States began to threaten denunciation" that any agreement to increase the personal-liability limits was reached, and even then, the United States "succeeded only in doubling the original Warsaw Convention liability limit to $16,600," in a proposed amendment to the Warsaw Convention known as the Hague Protocol. Dempsey & Milde, *supra*, at 19 n.51; Letter of Submittal, 1999 WL 33292734, at *3; *see* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, done at The Hague September 28, 1955. The United States, dissatisfied with the low liability limits, refused to ratify the Hague Protocol.[12]

In 1965, in response to what some courts have described as the "unconscionably low" liability limits under the Warsaw Convention, *Dunn v. Trans World Airlines, Inc.*, 589 F.2d 408, 411 (9th Cir. 1978), United States Secretary of State Dean Rusk gave Poland six months' notice

---

[12]In 2003, for reasons not germane to this opinion, the United States finally did ratify the Hague Protocol, but by that time, the personal-liability limits had long been raised, as we are about to discuss.

that the United States intended to denounce the Warsaw Convention. Dempsey & Milde, *supra*, at 29 n.87 (citing Dep't of State Press Release No. 268, 50 Dep't of State Bull. 923–24 (1965)). The notice included a proviso that the United States would retract its notice of denunciation if personal-liability limits were raised to $75,000 to $100,000 per passenger.

As a result of this notice, the ICAO held a conference in Montreal in 1966 at which the United States unsuccessfully sought to increase the personal-liability limits. The airlines themselves, however—including all major air carriers that served the United States—entered into a private intercarrier agreement (the Montreal Agreement) that made two broad changes to the Warsaw Convention's limitations. First, the Montreal Agreement increased the personal-liability limit to $75,000 per passenger. Second, the Montreal Agreement imposed strict liability up to the $75,000 limit (while retaining the preexisting provision that allowed liability beyond that limit upon a showing of willful misconduct by the airline). CAB Order E-23680 (May 13, 1966), 31 Fed. Reg. 7,302 (May 19, 1966), reprinted at 49 U.S.C.A. § 1502 (1970). The United States retracted its notice of denunciation. Dempsey & Milde, *supra*, at 30. The Montreal Agreement remained in force among its signatories for approximately thirty years, and was applicable to all carriage to, from, or through the United States.

In the wake of the Montreal Agreement of 1966, various other international agreements were also reached to increase liability. In 1974, various European and Japanese carriers agreed to increase passenger liability in an informal "Malta Agreement." *Id.* at 31. In 1992, Japanese carriers agreed to strict liability for personal injury up to 100,000 Special Drawing Rights per passenger.[13] And in 1995, a dozen airlines signed a "Washington Intercarrier Agreement," endorsed by the International Air Transport Association, to which the United States Department of Transportation had given antitrust immunity to facilitate discussion of the modernization of international air-carrier liability. *Id.* at 33–34. This Washington Intercarrier Agreement, signed in Kuala Lumpur, imposed strict liability up to 100,000 SDRs per passenger and *removed* the "willful misconduct" provision for liability beyond the cap, replacing that provision with

---

[13]The Special Drawing Right (SDR) "is an artificial 'basket' currency developed by the International Monetary Fund." Letter of Submittal, 1999 WL 33292734 at *4. On August 21, 2017, one SDR was worth approximately $1.42. Int'l Monetary Fund, *SDR Valuation* (Aug. 29, 2017), https://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

something more like a negligence standard that imposes unlimited liability above the 100,000-SDR cap if the airline cannot prove that it took "all necessary measures" to avoid the injury. The major United States-based airlines joined the Washington Intercarrier Agreement within a week of its initial signing in Kuala Lumpur. *Ibid.*

Also in the wake of the Montreal Agreement of 1966, aside from the private intercarrier agreements that were negotiated, the United States continued to seek amendments to the Warsaw Convention that would impose higher personal-liability limits. In 1971, the Guatemala City Protocol came close to achieving a limit of 1,500,000 gold francs (then equivalent to approximately $100,000) per passenger, but that Protocol would have imposed an *absolute* limitation on liability, even in cases of willful misconduct. *See id.* at 22–26. The United States Senate refused to ratify the Guatemala City Protocol in part because it used the gold standard for liability limits and because it would have imposed an absolute, unbreakable limitation on liability. In 1975, various "Montreal Protocols" were proposed at a diplomatic conference as part of an initiative to replace the Warsaw Convention's gold standard with the SDR. But the only protocol that entered into force worldwide was Protocol No. 4, which affected only cargo liability and not personal-injury liability. *See id.* at 26–29.

Against that backdrop, the Montreal Convention of 1999 was revolutionary: it replaced not only the Warsaw Convention but also "all of its related instruments and . . . eliminate[d] the need for the patchwork of regulation and private voluntary agreements" that then dominated the world's air-carrier liability regime. Letter of Submittal, 1999 WL 33292734, at *7. The Montreal Convention imposes strict liability for injuries that are compensable under Article 17(1), up to 100,000 SDRs per passenger, with a decennial adjustment for inflation. (The first official adjustment came in 2009, increasing the strict-liability limit to 113,100 SDRs—or approximately $160,000—per passenger. Montreal Convention arts. 21, 24; *see* Inflation Adjustments to Liability Limits Governed by the Montreal Convention Effective Dec. 30, 2009, 74 Fed. Reg. 59,017 (Nov. 16, 2009).) Above that strict-liability limit, a carrier remains liable for all damage sustained, with no limit, unless the carrier can prove either that "such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents," or that "such damage was solely due to the negligence or other wrongful act or omission

of a third party." Montreal Convention art. 21. Finally, an exoneration provision allows a reduction in compensation for injuries caused by or contributed to by the plaintiff, in the same manner as a pure-comparative-negligence or pure-comparative-fault scheme; this exoneration provision applies to all claimed damages including those falling under the strict-liability limit. Montreal Convention art. 20. In short, the Montreal Convention replaced a "restrictive," "pro-airline industry" regime, *Jack*, 854 F. Supp. at 662, 665, with "a treaty that favors passengers rather than airlines." *Lexington*, 501 F. Supp. 2d at 908 (quoting *Ehrlich*, 360 F.3d at 371 n.4 (describing Montreal Convention)). And it did so on terms that reflected decades of effort by the United States to abolish the outdated limitations of the Warsaw Convention.

Moreover, by 1999, when the Montreal Convention was opened for signature, the aviation industry was anything but "fledgling," and the purpose of the Montreal Convention was not to protect the aviation industry, but rather to provide a "modernized uniform liability regime for international air transportation." Letter of Submittal, 1999 WL 33292734, at *6.

In light of the great difference between the purpose of the Warsaw Convention and the purpose of the Montreal Convention, then, it hardly seems appropriate for us to look to the purpose of the *Warsaw* Convention, as Etihad would have us do in relying on *Ehrlich*, in order to arrive at a different conclusion from one compelled by the plain text of the Montreal Convention. Our Supreme Court's Warsaw Convention jurisprudence has relied consistently on analysis of the purpose of that treaty as it was implemented in 1929. *See, e.g.*, *Zicherman*, 516 U.S. at 221–23; *Saks*, 470 U.S. at 400–05; *Floyd*, 499 U.S. at 546. What the historical record makes clear is that the considerations favoring a close textual reading of the Montreal Convention—a product of at least five decades of international negotiations—far outweigh whatever considerations would weigh in favor of rewriting the text of the Montreal Convention in order to accommodate *Ehrlich* or effectuate the purpose of the Warsaw Convention, as Etihad would have us do.

### C. Relevant Warsaw Convention Litigation

We turn next to (1) relevant decisions of our Supreme Court under the Warsaw Convention; (2) a brief summary of our reasons for rejecting *Ehrlich* in light of the foregoing

discussion of the history and purpose of the Montreal Convention; and (3) a brief discussion of relevant district-court cases.

### 1. United States Supreme Court Decisions Under the Warsaw Convention

From 1984 to 2004, the United States Supreme Court handed down a series of seven opinions clarifying various aspects of the Warsaw Convention, most of which involved Article 17. The first of these, *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243 (1984), upheld the Convention's liability limit for cargo and is not particularly relevant to our case. More relevant is the Court's 1985 decision in *Air France v. Saks*, in which it held that "accident" in Article 17 of the Warsaw Convention means "an unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U.S. at 405 (denying passenger's recovery for deafness caused by cabin depressurization where the depressurization was ordinary and the plaintiff was the only passenger on the flight who was affected).

A year later, the Court decided *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989), holding that the Warsaw Convention's limitations applied even if an airline defendant failed to provide notice of the Convention in at least 10-point type as the airline defendant agreed to in the Montreal Agreement of 1966. *Chan*, 490 U.S. at 135 (holding that although Korean Air Lines had joined the Montreal Agreement in 1969 and had violated that agreement by providing notice of the Convention only in 8-point type, the Warsaw Convention's limitations still applied because the Montreal Agreement did not impose any sanction at all for failure to provide notice in the required typeface, let alone the sanction of forfeiting liability limitations).

In 1991, the Court decided *Eastern Airlines v. Floyd*, which as we noted earlier held that "bodily injury" in Article 17 of the Warsaw Convention does not allow for the recovery of mental injuries *on their own* (that is, with no physical injury incurred whatsoever), but which "express[ed] no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries." *Floyd*, 499 U.S. at 552. Next came *Zicherman v. Korean Air Lines* in 1996, in which the Court held that although the Warsaw Convention provided rules for liability and limitations of liability, it did not govern the *measure* (or calculation, so to speak) of damages, which was instead a matter to be determined in each case by applicable domestic law.

*Zicherman*, 516 U.S. at 225 ("[Q]uestions of who may recover, and what compensatory damages they may receive, . . . were unresolved by the Convention and left to 'private international law'—*i.e.*, to the area of jurisprudence we call 'conflict of laws,' dealing with the application of varying domestic laws to disputes that have an interstate or international component.").

In 1999, the Court decided *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, in which it held that the Warsaw Convention provided the sole remedy for personal-injury claims arising from injuries sustained during international air travel, even if the injured party could not state a claim for relief under the Warsaw Convention, in which case no remedy was available at all. *Tseng*, 525 U.S. at 161 (alleged assault by El Al agents during preflight security search that did not result in bodily injury was not an "accident" and was not compensable under the Warsaw Convention; the Warsaw Convention nevertheless continued to preempt local claims for damages from the assault).

Finally, in 2004, the Court decided *Olympic Airways v. Husain*, in which it clarified that finding an "accident" to have occurred for the purpose of applying Article 17 does not require identifying a *single* "injury producing event" but may rather involve a chain of causation that results in death or bodily injury, so long as there is an unexpected or unusual happening external to the passenger in that chain, following *Saks*.[14]  *Husain*, 540 U.S. at 651–54 (when asthmatic passenger died after flight attendant repeatedly but wrongly refused to reseat him away from the

---

[14]At oral argument, there was some confusion about what the "accident" was in this case: was it the airline's failure to clean out the seatback pocket, or was it the moment at which the needle in the seatback pocket pricked Doe's finger?  Under *Husain*, it is not terribly important to identify the moment of the accident so long as there was an accident.  That said, it seems clear in our case that the "unexpected or unusual happening" was the moment when the needle pricked Doe's finger; the airline's failure to clean the pocket was perhaps underlying negligence that allowed the accident to happen.  The confusion can be traced to a line from *Saks*, in which the Court stated that "the text of Article 17 [of the Warsaw Convention] refers to an accident *which caused* the passenger's injury, and not to an accident which *is* the passenger's injury."  *Saks*, 470 U.S. at 398.  What the Court meant there was that the mere fact of an unexpected or unusual *injury* (such as a passenger, for example, suffering a sudden heart attack during a flight) is not itself an *accident*—something unexpected and external to the passenger must itself cause an injury.  At oral argument, presumably in response to Etihad's argument that attempted to separate Doe's injury of bring pricked from the fact that Doe was pricked *by a needle*, see Section III.A.1, *supra*, Doe's counsel argued that Etihad's failure to clean the airplane was the accident and the needlestick was the bodily injury.  Both of those arguments are misplaced: the needlestick was simply an accident that caused a contemporaneous bodily injury. Nothing in the Montreal Convention or in the Warsaw Convention caselaw requires us to separate the accident from the bodily injury in cases like this one where there is no temporal gap between the accident and the bodily injury. Of course, in most cases, there is such a gap, as when an accident such as a crash landing causes *subsequent* and separately identifiable injuries—but in cases like ours, or perhaps in cases of insect bites or physical assaults by flight crewmembers, the accident and the bodily injury may logically be one and the same.

smoking section, the failure to reseat counted as an "accident," even though the presence of ambient smoke in the cabin—not itself an unexpected or unusual happening on a flight that allowed smoking—could be viewed as an "injury producing event").

*Saks*, *Chen*, *Floyd*, and *Zicherman* were all decided unanimously, and *Franklin Mint* and *Tseng* were both decided eight to one over the dissent of Justice Stevens.  *Husain* was decided six to two, with Justice Scalia dissenting, arguing that because two other Warsaw Convention signatories (England and Australia) had rejected the proposition that an airline's *inaction* could constitute an "accident" under Article 17, and because the text of Article 17 did not clearly resolve that issue, the Court should instead have followed the English and Australian decisions. *Husain*, 540 U.S. at 659–64 (Scalia, J., dissenting).

These opinions have enjoyed wide acceptance among our sister signatories, which have given them (especially *Saks*, *Tseng*, and *Floyd*) at least some deference and  have developed their own jurisprudence using these opinions as guideposts.  *See, e.g.*, *Plourde c. Service aérien F.B.O. inc.*, 2007 QCCA 739, para. 29 (Court of Appeal of Quebec) (applying *Floyd* to deny recovery for purely psychological injury in a Montreal Convention case); *Povey v. Qantas Airways Ltd.* (2005) 223 CLR 189, 190 (High Court of Australia) (applying *Saks* and considering *Tseng* and *Husain* in Warsaw Convention case); *King v. Bristow Helicopters Ltd* [2002] UKHL 7 (House of Lords) (applying *Saks*, *Tseng*, and *Floyd* in Warsaw Convention case).

Because these Supreme Court cases analyzed aspects of the Warsaw Convention that we have no reason to believe have changed following the ratification of the Montreal Convention (and that neither party has argued have changed following the ratification of the Montreal Convention), it is reasonable to conclude that these cases form part of the "precedent" consistent with which, according to the Explanatory Note (*see* n.11, *supra*), the drafters expected signatories to construe Article 17(1) of the Montreal Convention.  Accordingly, we have adopted *Saks*'s definition of "accident," and our discussion of damages in Section IV will be guided by *Zicherman*'s deference to the forum jurisdiction's choice-of-law rules.

### 2. Why the Second Circuit's Ehrlich *Decision Does Not Govern Montreal Convention Claims*

In light of the discussion in Sections III.A and III.B, there are several reasons why we decline to adopt *Ehrlich* to govern Doe's claims. First, Etihad's argument that we should adopt *Ehrlich* is unconvincing in part *because* of how thorough *Ehrlich* itself is: *Ehrlich* reaches its conclusion only after plumbing the depths of the original French meaning of the Warsaw Convention, *Ehrlich*, 360 F.3d at 376–78 (analyzing whether "dommage survenu en cas de . . . lésion corporelle" incorporates a requirement that the bodily injury [lésion corporelle] cause the damage [dommage]), French legal materials, *id.* at 380, the purpose of the Warsaw Convention, *id.* at 385, and the "negotiating history" of the Convention, *ibid.* Indeed, if *Ehrlich* is persuasive, it is persuasive not for the conclusion it reached but for how it got there, and our similarly searching analysis leads us to a conclusion opposite *Ehrlich*'s.

Second, *Ehrlich* interpreted the authoritative French text of the Warsaw Convention, and found ambiguity in that text (in the original French) that *Ehrlich* thought could accommodate a causal meaning.[15] Specifically, *Ehrlich* examined French-language dictionaries and found that the word "cas" in "en cas de" (the French phrase that was the Warsaw Convention analogue to the Montreal Convention's "in case of") could actually mean "cause." *Ehrlich*, 360 F.3d at 377–78 ("If 'cas' means 'cause,' then the phrase 'dommage survenu en cas de . . . lésion corporelle,' as those words are used in Article 17, would hold carriers liable for any 'damages sustained in the cause of . . . bodily injury.' Such a translation is amenable to an interpretation that would allow passengers to recover for mental injuries only where they were caused by a bodily injury."). Setting aside the fact that the French word *cas* does not actually mean "cause" except perhaps in the same way that we might say a "hopeless case" is a "lost cause,"[16] the range of ambiguity in the English "in case of" is far, far narrower than the range of ambiguity that *Ehrlich* found in the French "en cas de" and, as we concluded in Section III.A, notwithstanding any ambiguity in the English "in case of," the plain text of the English "in case of" does not contain a requirement that "damages sustained" be "caused by" bodily injury.

---

[15] *See* n.6, *supra*.

[16] *See, e.g., Cas*, Grand Dictionnaire Encyclopédique Larousse (1982).

Third, as we discussed in Section III.B, the purpose of the Montreal Convention vastly differs from the purpose of the Warsaw Convention, such that we have no reason to interpret Article 17(1) of the Montreal Convention in such a way as to serve the purposes of the Warsaw Convention, as *Ehrlich* did.

Fourth, although the *Ehrlich* court stated that its ruling was necessary to avoid anomalous results, it appears that under the Montreal Convention, following *Ehrlich* would be *more* rather than *less* likely to lead to anomalous results. *Ehrlich* explained its reasoning as follows:

> The interpretation of Article 17 favored by the [plaintiffs] would give rise to anomalous and illogical consequences because "similarly situated passengers [would be] treated differently from one another on the basis of an arbitrary and insignificant difference in their experience." For example, a passenger who sustained a mental injury but no bodily injury would be unable to look to Article 17 for relief whereas a co-passenger who suffered the same mental injury yet fortuitously pinched his little finger in his tray table while evacuating and thereby suffered an unrelated bodily injury would be able to hold the carrier liable under the Warsaw Convention.

*Ehrlich*, 360 F.3d at 386.

But our interpretation of Article 17(1) of the Montreal Convention does not necessarily imply this result. *Ehrlich*'s hypothetical here presumably involves some sort of crash or emergency landing (no context is provided in *Ehrlich* itself for the portion quoted above). Under our interpretation of the Montreal Convention, if an airplane crash-landed, then any passenger who sustained a bodily injury caused by that crash-landing would also be permitted to recover for mental anguish sustained in that crash-landing—i.e., anguish sustained "in case of" a compensable bodily injury. If a passenger sustained a broken leg, that passenger would be able to recover for the broken leg, for mental anguish caused by the broken leg, and for mental anguish arising from the crash-landing that accompanied the broken leg—all of that would be "damage sustained in case of" the broken leg. True, another passenger escaping the same crash-landing physically unscathed would be barred from recovering damages for mental anguish alone, but that's not an "anomalous" result. Rather, it is a result that is fully consistent with (and compelled by) the text of the Montreal Convention.

Returning to *Ehrlich*'s hypothetical of the passenger who escapes the same crash-landing entirely unscathed *except* for a pinched pinky finger: what result?  As we read the Montreal Convention, so long as that passenger can prove that the accident (i.e. the crash-landing) caused the injury to the pinky finger, that passenger would be able to recover both for the physical injury to the finger and for mental anguish sustained—and that passenger would be able to recover mental anguish sustained on the same terms as the passenger who suffered the broken leg.

None of these outcomes produce an "illogical or unreasonable result" that might caution against our ruling today.  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 816 F.2d 761, 766 (D.C. Cir. 1987).  Thus, we are not persuaded by *Ehrlich* that we must read in an additional causation requirement to avoid interpreting the Montreal Convention in a manner that would produce absurd results.

To the contrary, it would be odd to require the passenger to prove *which* mental injuries in fact *were* caused by the physical injury as opposed to being caused more generally by the accident.  In our crash-landing hypothetical, a passenger might, for example, be conscious for the duration of the crash-landing and then realize that he has suffered a grievous injury to his leg.  Perhaps the passenger fears losing the leg for hours or days while he is in the hospital.  And perhaps the passenger, who has a compensable bodily injury (bruised ribs and a broken leg), suffers mental anguish and other emotional damages—some as a result of the fear of losing the leg (which surely *would* be caused by the bodily injury, even if the leg was ultimately not lost), and some as a result of having experienced the crash-landing.

It would not "favor[] passengers," *Ehrlich*, 360 F.3d at 371 n.4, to require the passenger to prove which mental harms were caused directly by the broken leg as opposed to being caused more generally by the accident.  After all, causation is difficult.  Surely, for example, harm such as insomnia, fear of flying (or other fears), or emotional distress might initially result from the crash-landing but then be exacerbated by the bodily injury.  Would only the portion of harm traceable *and subsequent* to the bodily injury be recoverable?  Or, what if some of the harm resulted from the *realization* of an imminent crash-landing—should that harm be excluded from recovery because its cause preceded the accident, while harm occurring together with or flowing from the crash-landing *would* be recoverable?

Thus, at the end of the day, adopting *Ehrlich* would mean requiring Doe and other Montreal Convention plaintiffs to prove causation in a way that burdens the injured passenger far more than the text requires; *that* would be an anomalous result.

For all these reasons, we decline to adopt *Ehrlich*.

### 3. Relevant District Court Cases

We now turn to *Jack*, the district-court opinion that *Ehrlich* followed, and which was the first district-court opinion to analyze the text and history of the Warsaw Convention at any serious length. *Jack* followed on the heels of the Supreme Court's decision in *Floyd*. In the *Jack* case, where fire consumed a plane following an aborted takeoff and crash but all the passengers survived, the court addressed the question whether *Floyd*'s bar to recovering purely mental damages under the Warsaw Convention also meant that mental anguish was recoverable only if caused by bodily injury. *Jack*, 854 F. Supp. at 657. The court posited four theories for the recovery of emotional-distress damages under Article 17:

1. Emotional-distress damages are never recoverable. *Id.* at 665.

2. Emotional-distress damages are always recoverable as long as the plaintiff has a bodily injury, even if the bodily injury is wholly unrelated to the emotional distress. *Id.* at 665–66 (notably, the court found that this approach "would read emotional distress as damages resulting from the accident (as opposed to the injury), which is difficult to do under the wording of Article 17," although the court did not explain the difficulty). This theory is broader than our interpretation, in that it allows recovery for mental injuries that are wholly unrelated to a compensable bodily injury, which would seem to capture more than just those mental injuries "sustained in case of" a compensable bodily injury.

3. Emotional-distress damages are recoverable as "an element of the damages for bodily injury," but "need not be about the injury," so long as the distress occurs "at the same time or later than the bodily injury." *Id.* at 666–67 (noting that in a plane crash that caused an injury, distress about the plane crash would be recoverable so long as it occurred after the injury, just as federal common law would allow the victim of a

racially motivated false arrest to recover for emotional distress subsequent to physical injuries sustained, and not only for the minor physical injuries).  This theory attempts to limit the scope of recovery to something narrower than what the second theory would allow, but it does so by reading in a *temporal* element, which is not supported by the text of the treaty.

4. Emotional-distress damages are recoverable only if they are "caused by the bodily injury."  *Id.* at 667–68.  This was the approach *Jack* settled on and that *Ehrlich* adopted.

The problem with this purported tetralemma is that it omits a plausible fifth option—namely, our conclusion that mental injuries are recoverable if they are caused either by a compensable bodily injury or by the accident that causes a compensable bodily injury.  Thus, while *Jack*'s theoretical framework produces an elegant syllogism in support of *Jack*'s fourth theory, it is not one that we have reason to follow in interpreting the Montreal Convention.  Plus, as we noted above, *Jack* expressly acknowledged that its fourth theory "read a causal component into" the Warsaw Convention.  *Id.* at 668.

Etihad relies not only on *Jack* but also on *Rothschild v. Tower Air, Inc.*, 1995 WL 71053 (E.D. Pa. Feb. 22, 1995).  In *Rothschild*, a passenger (Joan Rothschild) bound for New York from Tel Aviv reached into a seatback pocket and—just like Doe—was pricked on the finger by a hypodermic needle that lay hidden within.  *Id.* at *1.  Mrs. Rothschild sued the airline for damages under the Warsaw Convention and Pennsylvania state law.  The airline removed the case from Pennsylvania state court to federal district court, where Mrs. Rothschild proceeded to jury trial and won a $10,000 verdict for her injuries.  But, although Mrs. Rothschild had been "permitted to testify about, and recover for, her pain and suffering flowing from the needle prick, such as any pain and suffering she experienced from the various tests that were performed on her," Mrs. Rothschild "was not permitted to testify about her fear of contracting AIDS and/or hepatitis because she did not show any exposure to these diseases, and permitting recovery under these circumstances would be purely speculative."  *Id.* at *2.  Mrs. Rothschild contended that the court improperly prevented her from testifying about her fear of AIDS and hepatitis and she thus moved for a new trial, presumably in pursuit of a larger damages award; her motion was denied.

Etihad relies on the denial of Mrs. Rothschild's motion for new trial to support its contention that "fear of AIDS/contagion is too speculative to be recoverable absent actual exposure." Appellee's Br. 20. But, for several reasons, *Rothschild* does not help Etihad. First, the *Rothschild* court expressly applied Pennsylvania state law, rather than the Warsaw Convention, in determining whether Mrs. Rothschild could recover for fear of contagion. *Id.* at *1 n.2, *2. The court noted that the parties "agree[d] that the Warsaw Convention [was] applicable" but that they had nevertheless based their arguments on Pennsylvania state law. *Id.* at *1 n.2. "Due to this apparent uncertainty of the parties as to the applicable law," the court stated its intention to "analyze this matter under both the Warsaw Convention and Pennsylvania law." *Ibid.* But the court did not actually apply the Warsaw Convention to determine which of Mrs. Rothschild's claims were cognizable; rather, the court cited *Jack* for the general proposition that emotional distress was recoverable only if it "related to and flow[ed] from" physical injury, *id.* at *1, and the court then turned to various cases decided under Pennsylvania state law to hold that "in order to recover for the fear of contracting a disease, a plaintiff must show that there has been some exposure to the disease." *Id.* at *2. Whether Pennsylvania state law does or does not require a plaintiff to prove actual exposure to a disease to recover for fear of contagion is a question that is not relevant to the matter before us, so this line of reasoning from *Rothschild* does not help Etihad.

Second, unlike Doe, Mrs. Rothschild was tested for AIDS only once—the day after the incident—and the *Rothschild* court's denial of her motion for new trial relied on the fact that "[d]uring the seven months between the injury and trial, Mrs. Rothschild was never again tested." *Id.* at *3. The *Rothschild* court might thus have had good reason to find, as a matter of fact, that Mrs. Rothschild's claimed fear of contagion was too speculative to support additional damages.

Third, the fact that Mrs. Rothschild proceeded to trial at all would seemingly help Doe more than it helps Etihad, especially in light of the fact that we are reviewing the district court's grant of partial summary judgment. How reasonable or speculative Doe's fear of contagion was is not a question of whether Etihad *may be liable* to Doe but is rather a question of fact (and a damages question, at that) that is properly resolved at trial rather than at summary judgment.

In sum, neither *Jack* nor *Rothschild* provides any basis on which to affirm the grant of partial summary judgment for Etihad.

### D.  The Montreal Convention in Our Sister Circuits

We now turn to recent Montreal Convention decisions of our sister circuits.  Since the ratification of the Montreal Convention, some of our sister circuits have applied *Ehrlich* in deciding Montreal Convention cases, but—so far, at least—they have done so without seriously considering either the text or the purpose of the Montreal Convention, and they have done so only in cases in which the outcome was not materially affected by the decision to apply *Ehrlich* rather than our interpretation of the text of Article 17(1).

The Eleventh Circuit, for example, affirmed a grant of summary judgment against a Montreal Convention plaintiff who traveled from Hawaii to Mumbai, India, and was refused entry (and ordered to return to the United States) by the Indian government for lack of proper immigration documentation.  He subsequently claimed that Korean Air Lines was liable for various alleged "accidents" including (1) an alleged theft of $2000 cash from him; (2) denial of access to medicine while his luggage was checked; (3) failure to call a doctor for him while in Mumbai or in transit in South Korea; (4) failure to provide diabetic meals on the return flight from Mumbai; (5) "detention" and lack of "proper hydration" in a holding area in South Korea; and (6) failure to assist him when his legs swelled and caused him to fall.  *Jacob v. Korean Air Lines*, 606 F. App'x 478, 482 (11th Cir. 2015) (per curiam) (first holding that plaintiff had failed to prove that any "accident" had happened on board that had caused him a bodily injury, then holding alternatively that plaintiff's damages were unrecoverable emotional damages).  In denying recovery for "*subsequent* physical manifestations of an earlier emotional injury," the court quoted *Ehrlich*'s statement that "mental injuries are recoverable under Article 17 only to the extent that they have been caused by bodily injuries."  *Id.* at 482 (quoting *Ehrlich*, 360 F.3d at 400).

*Jacob* does not conduct any analysis of the text of the Montreal Convention; in a footnote, the opinion notes that "[c]ourts interpreting the Montreal Convention may rely on authority concerning its predecessor, the Warsaw Convention, where provisions of both

conventions are similar." *Ibid.* (citing *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1177 (11th Cir.), *cert. denied*, 135 S. Ct. 759 (2014)). Notably, in *Campbell*, on which *Jacob* relies to support its adoption of Warsaw caselaw, the plaintiff had failed to state a claim under Article 17(1) of the Montreal Convention because his only claimed damages were economic losses arising from a delay. *Campbell*, 760 F.3d at 1167 ("He stated no Article 17 claim, however, because he did not allege injuries caused by an 'accident' . . . .").

Thus, neither *Jacob* nor *Campbell* had reason to consider whether mental damages accompanying a compensable bodily injury were recoverable under Article 17(1) of the Montreal Convention. Nor did *Jacob*'s use of *Ehrlich* amount to a reasoned decision to adopt *Ehrlich* as opposed to a competing approach to recovery for mental anguish under the Montreal Convention, because there was no "accident" in *Jacob* in the first place.

In its partial-summary-judgment order, the district court below cited *Bassam v. Am. Airlines, Inc.*, 287 F. App'x 309, 317 (5th Cir. 2008), an unpublished decision of the Fifth Circuit in which that court cited *Ehrlich* to support the proposition that "courts have held that emotional injuries are not recoverable under Article 17 of the Montreal Convention or Warsaw Convention unless they were *caused by* physical injuries." *Bassam*, 287 F. App'x at 317 (emphasis added). But *Bassam* was a case in which the plaintiff's *only* claimed injuries were emotional and not physical: in *Bassam*, the plaintiff sued the airline because one of her checked bags was lost for several months during which time the plaintiff suffered "embarrassment and upset of not being able to dress and appear in public as was her prior practice." *Id.* at 311. Indeed, the *Bassam* opinion itself makes clear that in citing *Ehrlich*, *Bassam* was not deliberately interpreting "in case of" to mean "caused by" (that is, *Bassam* was not deliberately adopting *Ehrlich* to define "in case of" in the Montreal Convention), but rather was establishing that the plaintiff could not show any accident or bodily injury that would be required to recover for emotional injuries under Article 17(1) of the Montreal Convention:

> Bassam has not alleged any physical injury. Moreover, even if her claim of "embarrassment and upset" could be construed as such, that injury was not caused by an accident on board the aircraft or in the course of embarking or disembarking. Therefore, Bassam has failed to establish carrier liability for emotional distress damages under Article 17(1).

*Id.* at 317.  Etihad's reliance on *Bassam*, and the district court's use of *Bassam* to support its grant of partial summary judgment in this case, are thus unfounded.[17]

Finally, it is worth noting that some courts have looked to the relative histories of the Warsaw and Montreal Conventions to support reaching a different conclusion under the Montreal Convention than what the Warsaw Convention might have dictated.  *See Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1058, 1058 n.7 (11th Cir. 2009) (affirming the dismissal of Montreal Convention claims on forum non conveniens grounds when parallel Warsaw Convention claims would not have been subject to such dismissal; distinguishing the instant case from "cases [that] involved interpretation of the Warsaw Convention, a predecessor to the Montreal Convention drafted in 1929, at which time forum non conveniens, in its current form, was not recognized under U.S. law").

## E.  Relevant Foreign Law

When we interpret a treaty provision, "the opinions of our sister signatories [are] entitled to considerable weight."  *Saks*, 470 U.S. at 404 (quoting *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir. 1978)); *see also Husain*, 540 U.S. at 660 (Scalia, J., dissenting) ("We can, and should, look to decisions of other signatories when we interpret treaty provisions. Foreign constructions are evidence of the original shared understanding of the contracting parties.").

Most Montreal Convention litigation in the European courts has involved the interplay between the Convention and various European Union Regulations, specifically in cases of delays and lost baggage.  *See, e.g.*, Case C-94/14, *Flight Refund Ltd v. Deutsche Lufthansa AG*,

---

[17]Other than *Bassam*, the only other Montreal Convention case cited by the district court is *Baah v. Virgin Atl. Airways*, 473 F. Supp. 2d 591, 595–56 (S.D.N.Y. 2007).  The court cited *Baah* to support the proposition that "[c]ourts routinely look to legal precedent interpreting the Warsaw Convention for substantively equivalent provisions of the Montreal Convention."  But *Baah* dismissed the plaintiff's claims for lack of subject-matter jurisdiction, and the "substantively equivalent provisions" of the Warsaw and Montreal Conventions that *Baah* analyzed were the jurisdictional requirements in each treaty (and specifically the phrase "place of destination" in each)—not Article 17, and not any provision that would be subject to reinterpretation in light of the ratification of the Montreal Convention.  All the cases cited by the district court other than *Bassam* and *Baah* are Warsaw Convention decisions.

2016 E.C.R. 148 (Court of Justice) (delay-compensation claim); Case C-63/09, *Walz v. Clickair SA*, 2010 E.C.R. I-4239 (Court of Justice) (lost-baggage claim). But some cases have involved the interpretation of Article 17(1). The Supreme Court of the United Kingdom has reaffirmed, for example, that "injury to feelings . . . related to [a passenger's] treatment during the process of embarkation and during the flight, which made him feel humiliated" is not a "bodily injury" under Article 17(1) of the Montreal Convention. *Hook v. British Airways Plc* [2014] UKSC 15, 2014 WL 795206, at *6.

One Canadian court, engaging in a mode of analysis substantially similar to ours in this case, applied *Floyd* and considered *Ehrlich* in declining to interpret "bodily injury" in Article 17(1) of the Montreal Convention to include purely psychological injuries caused by an emergency landing. *Plourde*, 2007 QCCA 739, at para. 29.

None of these cases, however, confronted the question of whether mental anguish that accompanies a compensable bodily injury, rather than only mental anguish caused by a bodily injury, is recoverable under Article 17(1).

Indeed, the only foreign case we can find that has confronted that question is a decision of a trial court in British Columbia, which—citing *Floyd* and *Ehrlich* favorably—required a "sufficient causal link" between the bodily injury and the mental injury in order for the mental injury to be compensable:

> In some cases, the causal link between the bodily injury and the mental injury will be clear. For example, an airline passenger who suffers burns on his or her face as a result of an aircraft fire will undoubtedly suffer mental anguish. So long as the bodily injury is proven, the mental injury proven to have been caused by it will be compensable.

*Wettlaufer v. Air Transat A.T. Inc.*, 2013 BCSC 1245, para. 82 (2013) (where a passenger aboard an Air Transat flight from Vancouver to Cancun was struck by "an unsecured food cart" upon landing, the passenger recovered money damages under Article 17(1) to compensate her for both her bodily injury and the emotional damages resulting from her fear of being "bumped" while driving or walking in public, but *not* to compensate for fear of flying "because there is not a sufficient causal link between such a fear and the whiplash-type injury" sustained).

Despite *Wettlaufer*'s "sufficient causal link" language, the relief ordered in *Wettlaufer* is entirely consistent with the relief Doe seeks here and with our interpretation of Article 17(1): the "accident" that harmed Wettlaufer was being struck by the food cart, her "bodily injury" included the resulting bruises on her back and neck, and her recoverable emotional damages— fear of being "bumped"—seemingly *must* have been caused not by the bruises themselves, but from the fact that she was bumped by a food cart (that is—again, despite the language used by the court—her emotional damages were caused by the *accident* that caused the bodily injury, and those emotional damages were nevertheless recoverable). Further, denying Wettlaufer's recovery for fear of flying is consistent with the text of Article 17(1) as well, because fear of *flying* might not be the sort of fear "sustained in case of" bruises caused by a runaway food cart. *Wettlaufer* does not seriously explore the language "damage sustained in case of," and it is only the decision of a provincial trial court rather than a sister signatory's high court. Even if we were to accord it the same weight as a decision of a high court, however, it would not give us reason to believe that our decision today is at odds with the "shared understanding of the contracting parties" to the Montreal Convention. *Husain*, 540 U.S. at 660.

### F.  The Montreal Convention Imposes Liability for Emotional and Mental Harms Accompanying a Compensable Bodily Injury

In light of the foregoing discussion, we now provide a brief summary of our decision and its application to Doe's case. For ease of reference, we state again the full text of Article 17(1) of the Montreal Convention:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Montreal Convention art. 17(1).

To prevail on a claim for damages under Article 17(1), a plaintiff must prove that (1) there was an "accident," defined as "an unexpected or unusual event or happening that is external to the passenger," *Saks*, 470 U.S. at 405; (2) the accident happened either "on board the aircraft" or during "the operations of embarking or disembarking"; and (3) the accident caused "death or bodily injury of a passenger." The carrier is then liable for damage sustained, which

we interpret to include emotional or mental damages, so long as they are traceable to the *accident*, regardless of whether they are caused directly by the bodily *injury*.

A simple example serves to illustrate our understanding. Consider a case in which an overhead bin unexpectedly opens in flight, causing a suitcase to fall out and strike a passenger in the eye. The passenger might sustain bodily injury—bruises, broken or fractured bones, a concussion, etc.—and the passenger might sustain mental anguish such as the fear of losing sight in the injured eye or a fear of being struck by flying objects. The "accident" would be the suitcase striking the passenger. (The faulty overhead bin or latch, like the airline's failure to clean out the seatback pocket in Doe's case, might be underlying negligence that precipitated the accident.) The accident happened on board the aircraft. And the accident caused bodily injury. Thus, the carrier would be liable for the passenger's damage sustained as the result of being struck by the suitcase—including such mental anguish as fear of losing sight, even if the passenger ultimately did not suffer a loss of vision, and even if the fear of losing sight was not caused directly by a bodily injury.

The following diagram illustrates this result:



Under Etihad's framework, a plaintiff seeking to recover damages for mental anguish would instead have to prove that an accident caused bodily injury, which in turn caused the

mental anguish.  But that framework is neither found in the text of the Montreal Convention nor supported by the history and purpose of the Montreal Convention, nor do relevant decisions of the courts of the United States or sister signatories give us reason to adopt Etihad's understanding.

Here, the accident was the needle pricking Doe's finger.  The accident happened on board Etihad's aircraft.  And the accident caused bodily injury, as Etihad has conceded.  Etihad is therefore liable for Doe's damage sustained, which includes both her physical injury and the mental anguish that she is able to prove that she sustained.  Assuming that, on remand, Doe is able to prove fear of contagion or other mental anguish, Etihad is liable for damages arising from that anguish regardless of whether the anguish was directly caused by the physical hole in Doe's finger or by the fact that Doe was pricked by a needle.  The diagram at page 14, *supra*, illustrates this result.

## IV

### Michigan Damages Laws Govern the Measure of Doe's Recovery and Any Recovery by Doe's Husband for Loss of Consortium

Having determined that the Montreal Convention does not preclude Etihad's liability for Doe's mental-anguish claims, we turn to the choice-of-law question of whose law governs the measure of any recovery to which Doe is entitled.  Although the district court did not expressly (or implicitly) address this question in its order granting partial summary judgment, the question was raised in the parties' summary-judgment pleadings below.  On appeal, Plaintiffs' brief includes a lengthy discussion of whether federal common law or Michigan law determines the extent of Doe's recovery for mental anguish.  Appellants' Br. 23–29.  Etihad responds at even greater length in its brief.  Appellee's Br. 26–37.  For the reasons that follow, Michigan law governs both the measure of Doe's recovery and the ability of Doe's husband to recover damages for loss of consortium.

Article 29 of the Montreal Convention clarifies that actions under Article 17(1), such as Plaintiffs' action, are brought "without prejudice to the question as to who are the persons who have the right to bring suit and *what are their respective rights*."  Montreal Convention art.

29 (emphasis added). As we discussed in Section III.C.1, *supra*, the United States Supreme Court has held that the effect of the parallel provision in the Warsaw Convention (Article 24) is to leave to the domestic law of the contracting parties the determination of how a successful plaintiff's damages are measured. *See Zicherman*, 516 U.S. at 224–26. Lower courts have consistently applied *Zicherman* to hold that the measure of damages is to be fixed according to whatever law (i.e., according to whatever choice-of-law rules) would apply in a domestic-law case, and *Zicherman* is one of the Warsaw Convention "precedents" that guides our interpretation of the Montreal Convention. *See* Section III.A & n.11, *supra*; *see also Pescatore v. Pan Am World Airways, Inc.*, 97 F.3d 1, 4–5 (2d Cir. 1996) (applying *Zicherman* to reject the argument that a uniform "federal common law" should provide the measure of damages for plaintiffs bringing claims on behalf of victims killed in the bombing of Pan Am Flight 103 over Lockerbie, Scotland, and instead conducting a choice-of-law analysis to conclude that Ohio damages laws applied and that Ohio law allowed plaintiffs to recover damages for loss of society, support, and services, and for grief).

In this case, then, the district court should measure Doe's damages by whatever law would apply to an analogous case in the Eastern District of Michigan. An analogous case would be a diversity action for personal-injury damages. A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). And "a federal court in a diversity action is obligated to apply the law it believes the highest court of the state would apply if it were faced with the issue." *Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990).

Our court has previously recognized Michigan's strong presumption in favor of applying Michigan law in Michigan courts:

> Michigan's choice of law framework is established in two Michigan Supreme Court decisions: *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292, 302 (1987), and *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562 N.W.2d 466, 471 (1997). In a tort action, Michigan courts recognize a presumption in favor of *lex fori* and apply Michigan law "unless a 'rational reason' to do otherwise exists." *Sutherland*, 562 N.W.2d at 471. The two-step test for determining whether such a rational reason exists was distilled in Sutherland from Olmstead as follows:

> First, we must determine if any foreign state has an interest in
> having its law applied. If no state has such an interest, the
> presumption that Michigan law will apply cannot be overcome. If
> a foreign state does have an interest in having its law applied, we
> must then determine if Michigan's interests mandate that Michigan
> law be applied, despite the foreign interests.

*Id.*

*Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013).

Neither party here has asserted a "rational reason" for us to hold that any law other than Michigan's damages laws should apply to govern the measure of Plaintiffs' recovery, including any recovery by Doe's husband for loss of consortium. Plaintiffs are Michigan residents, so there is no reason to apply the substantive law of any state in the United States other than Michigan. And Etihad has not argued that the law of the United Arab Emirates should apply.

Michigan's substantive damages laws therefore govern the measure of any recovery that Plaintiffs win. On remand, assuming Doe wins a judgment, the district court is free to determine, within the bounds of what Michigan damages laws allow, what specific kinds of damages—such as emotional distress, mental anguish, fear of contagion, loss of consortium, and so on—Plaintiffs are entitled to recover, in "grant[ing] the relief to which each party is entitled." Fed. R. Civ. P. 54(c).

## V

The Warsaw Convention ruled aviation law for more than seventy-five years. Over the decades, despite various amendments, courts have routinely interpreted the Warsaw Convention in line with its purpose as drafted in 1929. Etihad urges us to interpret the Montreal Convention in line with that same purpose.

But the Montreal Convention is not an amendment to the Warsaw Convention. The Warsaw Convention provided limitations of liability to protect fledgling airlines from litigious passengers; the Montreal Convention provides limitations of liability to protect (still litigious) passengers from the not-so-fledgling airlines. To adopt Etihad's reading of the Montreal Convention would distort the treaty's text and would frustrate rather than serve its purpose.

No. 16-1042                 *Doe, et al. v. Etihad Airways*                 Page 41

Having determined that the Montreal Convention imposes liability for the damages that Doe has alleged, and that the damages laws of Michigan govern the measure of any judgment Plaintiffs win, we **REVERSE** the district court's partial-summary-judgment order and **REMAND** this matter for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 16-1042

JANE DOE; JOHN DOE, husband and wife,
    Plaintiffs - Appellants,

    v.

ETIHAD AIRWAYS, P.J.S.C.,
    Defendant - Appellee.

**FILED**
Aug 30, 2017
DEBORAH S. HUNT, Clerk

Before:  BOGGS, SUHRHEINRICH, and McKEAGUE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's partial-summary-judgment order is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk